# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

LONNIE SCANDRICK,                    :

      Petitioner,                    :          Case No. 3:12cv0002

 vs.                                            :          District Judge Thomas M. Rose
                                      Chief Magistrate Judge Sharon L. Ovington

WARDEN, Lebanon                    :
Correctional Institution,
                                               :
      Respondent.                    :

                                               :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

One April evening in 2008, Christopher Ousley was fatally shot in front of his local convenience store.  Witnesses heard the gunshots and saw two men with guns, Petitioner Lonnie Scandrick and his cousin, standing over the victim. Scandrick was arrested walking back to his home from the store, illegally carrying a concealed .40 caliber handgun and extra magazine.  In state court, he was ultimately convicted of felony murder with a firearm specification and is presently serving a sentence of 22 years to life at the Lebanon Correctional Institution.  (Doc. #5, PageID at 280).

Scandrick brings this habeas corpus case *pro se*, asking the Court to grant his

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Petition. (Doc. #1, PageID at 14). This case is before the Court upon Scandrick's

Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody

(Doc. #1), Respondent's Answer/Return of Writ (Doc. #5), Scandrick's Traverse (Doc.

#7), and the record as a whole.

## II.  BACKGROUND

### A.  Underlying Facts

A grand jury indicted Scandrick on one count of murder (proximate result), one

count of felonious assault (serious harm), one count of felonious assault (deadly weapon),

one count of carrying a concealed weapon, and one count of having weapons while under

disability. (Doc. #5, PageID at 155). Scandrick pled not guilty to the first three charges,

and guilty to the last two. (*Id.*) The Ohio Court of Appeals described the witness

testimony supporting Scandrick's conviction at trial, beginning in February 2009, as

follows:

> The victim . . ., Christopher Ousley, was shot and killed by Scandrick and
> another defendant, Timothy Reid, in front of Nathan's Superette ("Nathan's") . . . .
>
> Cheryl Scroggins was a witness to the shooting of Ousley. . . . [S]he
> testified that on the date of the shooting a man she knew as "Lonnie B." . . . asked
> her for a cigarette in front of Nathan's, and that an older man was with him whom
> she later learned was Timothy Reid. While Scroggins walked home from
> Nathan's, she encountered Ousley, whom she knew as "Squiggy," walking toward
> the market. Scroggins later heard a gunshot from the direction of the market, and
> when she turned around, she "saw two guys standing on the side of Squiggy. They
> look like they were arguing." Scroggins stated that Squiggy "was standing there
> with his hands up like he was trying to explain something." "Lonnie B." then
> threw Squiggy to the ground, and Reid drew a gun and fired a couple of shots at
> Squiggy. According to Scroggins, Reid's gun jammed, and he "passed it to Lonnie
> B., and he did something where it popped, and he gave it back to [Reid]." When

2

Lonnie B. fired the weapon, it was aimed "at Squiggy's body." Scroggins observed Reid tell the clerks standing in the doorway of Nathan's to remain in the store, and then both men left the area. Scroggins later identified Scandrick in a photo spread as Lonnie B. In court she testified that Scandrick "favored" the man she knew as Lonnie B.

Anthony White also witnessed the shooting. White was in a vacant house across the street from Nathan's, where he had gone to "shoot" heroin. As he stood by the window at the front of the house, he testified that Scandrick ". . . shot and killed little Chris." According to White, Scandrick was with "some other dude" who was "standing by the alley." White stated that he observed a gun in Scandrick's hand. He heard Ousley tell Scandrick to leave the area before the police arrived, and Scandrick replied, "Fuck the police. I'm the police," and he shot Ousley. White stated that he believed the bullet from Scandrick's weapon entered Ousley's back shoulder. White testified that he heard a total of three shots. After the shooting, White testified that Scandrick and the man he was with walked away together. White did not speak to the police about what he observed until June. He was incarcerated at that time, and he asked his lawyer to contact the police. After he was shown a photo spread, White identified Scandrick, and he also identified another man in the same photo lineup. White identified Scandrick in court as the shooter.

Majed Saleh, whose nickname is Mark, was working at Nathan's with his cousin, Ibrahim Saleh, whose nickname is Sean, at the time of the shooting. Mark was standing at the cash register, and he observed Ousley, a regular Nathan's customer, pass by the front of the market. Shortly thereafter, Mark heard a gunshot, and he and Sean went to the door. Mark stated that he observed Ousley on the ground in front of the market, and "two guys with guns" standing over him. One of the men gestured for Mark to "go back in" the store. Mark went to the back of the store and dialed 911, reporting "two guys shot one guy," and "they're still shooting." In total he heard two or three gunshots. Mark identified Scandrick in a photo spread and also in court.

Sean Saleh testified that he was working "at the lottery" when he heard a gunshot. He looked outside and observed Scandrick with a gun in his hand facing Ousley, who was standing near him. Ousley and Scandrick spoke to each other briefly, and then Ousley knocked Scandrick to the ground, according to Sean. Scandrick dropped his weapon, and it slid under a car. Sean heard another gunshot, and he observed another man in front of a parked car in front of the store with a gun in his hand. Sean testified that the second gunman's weapon was jammed, and "he was fixing it." Sean recognized both of the gunmen, and he

3

testified that "they used to come to the store always together, buy some beer and leave." After the second shot, Sean testified that Ousley, who was on top of Scandrick on the ground, rolled off and "was on the floor." Sean heard Ousley call Sean's name, and he ran to the back of the store and took the phone from Mark, telling the 911 dispatcher that they needed help. Sean then returned the phone to Mark and ran back to the front door of the store. At that time, Scandrick, with a gun in hand, was attempting to remove a brown bag from Ousley's pocket, and "Chris was on the floor, doing like this, like don't touch. Move." Sean then observed Scandrick shoot Ousley in the leg. When Sean began to open the door to the store, he testified that Scandrick told him to "back up." After the police arrived, Sean went outside and noticed that the brown bag in Ousley's pocket was gone. Sean initially told the police that he did not observe the shooters' faces. When he was shown a photo spread, Sean testified that he recognized Scandrick but did not select his photo. Sean identified Scandrick in court.

Officer Steve Bryant, a crime scene investigator for the Dayton Police Department, testified that he collected two .40 caliber spent shell casings and Ousley's clothing from the scene, his clothing having been removed by the paramedics. . . .

Sergeant James Mullins of the Dayton Police Department testified that he . . . observed Scandrick, "a black male in gray on the sidewalk." [Mullins and his partner Rodney Barrett] approached, exited their cruiser, and told Scandrick to stop. The officers observed that Scandrick had a "dark colored hat" in his hand, which he threw to the ground. As "the hat went down to the ground, a pistol fell out of the hat and the magazine also fell out of the hat." The pistol was a .40 caliber Glock.
 . . .

As Mullins patted Scandrick down, locating a second magazine in Scandrick's rear pocket, Barrett observed another male running in the alley . . . . Barrett pursued the other suspect. At that time, Scandrick, according to Mullins, "made the statement out of the blue, [']that guy beat up my boy. He beat him up over drugs.[']" . . . Mullins identified Scandrick in court as the suspect he and Barrett apprehended. . . .

Barrett . . . testified that as he pursued the second suspect, who was wearing a gray jacket, he observed that "he had a brown paper bag in his hand as he was running. It appeared to be a bag . . . of possible liquor or a can of alcohol." Barrett lost sight of the second suspect, and having been advised of [Scandrick's] address, he proceeded to that location with another officer. When Barrett

4

approached the front door, which was open, he observed a "brown bag like the one I saw the individual I was chasing carrying," sitting on top of a television inside the home. . . .  The officers found Timothy Reid in a bedroom under a blanket. They also recovered a gray jacket in another bedroom that Barrett recognized from his pursuit of Reid.

Amy Rismiller, a forensic scientist in the serology DNA section of the Miami Valley Regional Crime Laboratory ("Crime Lab") testified that blood stains on Scandrick's gray knit jacket [tested] positive for the presence of Ousley's DNA.

Timothy Duerr, a forensic scientist from the Crime Lab and an expert in the area of firearms and toolmark examination, testified that . . . the bullets were greater than a .32 caliber, and also "fell within [the] classification" of .9 millimeter projectiles. . . .  Duerr opined to a reasonable degree of scientific certainty that the casings [recovered from the scene] were expelled from the weapon Scandrick discarded when he was apprehended. . . .

(Doc. #5, PageID at 155, 159-63.)

The Ohio Court of Appeals also described Scandrick's testimony in his own

defense.  According to Scandrick, his cousin Timothy Reid had lived with him until about

a month before the shooting.  The men had been at Nathan's together earlier in the day,

with Scandrick entering the store and Reid staying outside to "buy some weed."  (Doc.

#5, PageID at 165).  As Scandrick began to walk home, it appeared that Reid was

involved in an altercation, and Reid soon returned to Scandrick's home "in distress.  He

was holding his head."  (*Id.*)

Once in the house, Scandrick noticed that the "house gun," a .9 millimeter German Reuger [sic], . . . was missing.  The gun bag was "by the couch on the floor." . . . Scandrick testified he then thought Reid "was going to seek revenge."

According to his testimony, Scandrick then decided to go to Nathan's to get some bread.  He retrieved the .40 caliber Glock . . . along with a magazine sitting beside it, since "this [is] kind of a rough neighborhood and plus what had just happened earlier that day."  Scandrick put the pistol in his waistband and covered

5

it with his gray sweatshirt and walked to the store, where he encountered Ousley, whom Scandrick knew as a drug dealer.  Scandrick testified that he told Ousley that Reid was "out here with a gun and if I was you I wouldn't be up here." …[W]hen [Scandrick] turned to leave, Ousley "came across my chest with something and I went up in the air . . . and I was dazed.  And, that's when he jumped on top of me.  And, then somebody came . . . out of the alley and started shooting."  Scandrick testified that the lone shooter was Reid.

According to Scandrick, when Ousley took him to the ground, the Glock fell out of his waistband and slid under a nearby car.  Ousley then "slumped," and Scandrick pushed him to the side and retrieved his pistol while Reid continued fire. . . .  [Scandrick] ran to Reid and called his name twice, and when Reid did not respond, Scandrick admitted that he "turned around and shot in the ground twice.  Then it seemed to make [Reid] snap out of whatever he was in."  . . .When Reid stopped shooting, he reached into to Ousley's pockets and removed something from them and ran back down a nearby alley.  Scandrick walked in the direction of his home and was apprehended. . . .

On cross-examination, Scandrick . . . admitted telling the officer "he jumped on my . . . dude."  Scandrick admitted that he initially told the police that a man named Mark Green fired the .40 caliber Glock pistol . . . .  He later admitted he was lying when he told the police that Green fired the Glock, and he stated, "Mark Green, . . . I just made that up."

(Doc. #5, PageID at 165-67).

**B.  <u>Procedural History</u>**

The jury returned guilty verdicts on the charges of murder and felonious assault, and the court sentenced Scandrick accordingly in March of 2009.  On appeal, Scandrick alleged two assignments of error.  First, he asked the Ohio Court of Appeals to consider "whether [his] conviction and sentence for the murder charge was supported by sufficient qualitative and quantitative evidence, erroneous as a matter of law, and thereby violated [his] constitutional right to due process."  (Doc. #5, PageID at 156).  The court found that the conviction and sentence were supported by sufficient evidence.  (Doc. #5, PageID at

6

167-69).  Second, Scandrick asked the court to consider "whether it was error to sentence [him] on two separate felonious assault charges derived from a single act and animus precluded [his] constitutional rights to due process."  (Doc. #5, PageID at 169-70).  The court sustained this second assignment of error, remanding the case for merger of the two felonious assault offenses and additional merger of the "surviving felonious assault offense with Scandrick's felony murder offense," with appropriate resentencing.  (Doc. #5, PageID at 175).  In November 2010, the trial court followed these instructions, leaving Scandrick with a total sentence of 22 years to life.  (Doc. #5, PageID at 280).

Scandrick appealed the Court's holding with respect to the insufficient evidence claim, once with counsel and once *pro se*.  The Ohio Supreme Court denied both appeals, on grounds that they presented no substantial constitutional question.  (Doc. #5, PageID at 212, 278).

C.  **Habeas Corpus Claim**

In the present case, Scandrick's habeas petition raises one ground for relief: insufficient evidence. (Doc. #1, PageID at 5).  He contends that the eyewitness testimony was flawed, and that all evidence against him was "circumstantial at best."  (Doc. #1, PageID at 5).  In his Traverse, he also claims that exculpatory evidence was improperly excluded, and therefore his appellate counsel was ineffective for failing to raise that issue and in any event he should be subject to the actual-innocence exception to procedural default.  (Doc. #7, PageID at 878-89).

The Warden responds that under the applicable standard of review, Scandrick's

conviction and sentence are supported by "ample evidence," as detailed in the Court of Appeals' analysis. (Doc. #5, PageID at 43-47). The Warden points in particular to the testimony of witnesses who saw Scandrick shoot at Ousley, the fact that Scandrick was arrested in the vicinity of the incident with a handgun that matched spent casings at the scene, and the presence of Ousley's blood on Scandrick's clothing. (Doc. #5, PageID at 46). The Warden further argues that Scandrick's own account is severely undermined by previous false statements to police. (*Id.*)

## III. DISCUSSION

### A. AEDPA

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a habeas petition with regard to any claim that was adjudicated on the merits in the state court unless the adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of clearly established law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented the the state court. 28 U.S.C. §2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

"'[A] federal habeas court may not issue a writ under the unreasonable application clause simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established Federal law erroneously or incorrectly.'" *Lovell v. Duffey*, 629 F.3d 587, 594 (6th Cir. 2011) (quoting *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "Rather, the issue is whether the state court's application of clearly established federal law is 'objectively unreasonable.'" *Lovell*, 629 F.3d at 594 (quoting *Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001) and *Williams*, 529 U.S. at 410) (other citation omitted). To obtain relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

## B.   **Exhaustion of State Remedies and Procedural Default**

A state prisoner seeking a writ of habeas corpus must first attempt to gain relief from his conviction and sentence in state court, raising his claims as mandated by the state's adequate and independent procedural rules. *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000). Failing to exhaust the state's remedies may result in procedural default, forever blocking the path to federal habeas review. *See Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004); *see also Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing, in part, *Coleman v. Thompson*, 501 U.S. 722, 749 (1991)); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). The Sixth Circuit Court of Appeals requires a four-part analysis when a respondent alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d

135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural
> rule that is applicable to the petitioner's claim and that the
> petitioner failed to comply with the rule. . . .  Second, the
> court must decide whether the state courts actually enforced
> the state procedural sanction. . . .  Third, the court must decide
> whether the state procedural forfeiture is an adequate and
> independent state ground on which the state can rely to
> foreclose review of a federal constitutional claim.  [O]nce a
> court determines the petitioner did not comply with a state
> procedural rule, and the rule is an adequate and independent
> state ground, then the petitioner must demonstrate cause for
> not following the procedural rule and prejudice resulting from
> the alleged constitutional error.

*Reynolds,* 146 F.3d at 347-48.

### C.    **Insufficient Evidence**

Scandrick unsuccessfully sought relief in the Ohio Supreme Court on his habeas

claim of insufficient evidence and has therefore exhausted all state remedies.  However,

his claim is without merit because it fails to overcome the deference to both the trier-of-

fact and state court of appeals that is required by law.  See *Jackson v. Virginia*, 443 U.S.

307 (1979); 28 U.S.C. § 2254(d).

Sufficient evidence supports a conviction if, after viewing the evidence (and the

inferences to be drawn therefrom) in the light most favorable to the prosecution, the court

can conclude that any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)

*Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006); *Brown*, 441 F.3d at 351; *United*

*States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 2909

(2006). "This requires successful challengers to meet a very high threshold, even with respect to newly-discovered evidence." *Apanovitch*, 466 F.3d at 488 (citing *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This standard of review does not permit the federal court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).

An attack on the credibility of witnesses is simply a challenge to the quality of the government's evidence and is not a valid challenge to the constitutional sufficiency of the evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *see also Jamieson*, 427 F.3d at 402 ("we may not consider the credibility of witnesses or weigh the evidence"). The Ohio Court of Appeals considered and rejected Scandrick's arguments concerning the sufficiency of evidence as follows:

> "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' *State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492*, * * * paragraph two of the syllabus, following *Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560*; see, also, *State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541*, * * * ." *State v. McKnight, 107 Ohio St.3d 101, 112, 2005 Ohio 6046, P 70, 837 N.E.2d 315*.
>
> "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost

its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Dossett, Montgomery App. No. 20997, 2006 Ohio 3367, P 32.*

The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.* "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, 1997 Ohio App. LEXIS 3709.*

This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03, 1997 Ohio App. LEXIS 4873.*

*R.C. 2903.02(B)* provides, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of *section 2903.03* or *2903.04 of the Revised Code*." *R.C. 2903.11(A)* provides, "No person shall knowingly do either of the following: (1) Cause serious physical harm to another * * * ; (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

The jury was instructed that they could convict Scandrick not only if they determined he was the principal offender but also if they instead determined that he aided and abetted Reid, and Scandrick does not dispute that he was subject to conviction under the complicity statute, *R.C. 2923.03(A)(2).* "'To support a conviction for complicity by aiding and abetting pursuant to *R.C. 2923.03(A)(2)*, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.'" (citations omitted). *State v. Sims, Clark App. No. 2008 CA 92, 2009 Ohio 5875, P 46.*

*******

Having reviewed the evidence in a light most favorable to the prosecution, we

12

conclude that any rational juror could have found the essential elements of murder and the felonious assault offenses proven beyond a reasonable doubt, whether Scandrick acted as a principal or aided and abetted Reid. Further, having thoroughly reviewed the entire record, weighed the evidence and all reasonable inferences, and having considered the credibility of the witnesses, we cannot conclude that Scandrick's conviction is against the manifest weight of the evidence.

Dr. Brian Casto gave detailed testimony regarding the "multiple gunshot wounds" that killed Ousley and the bullets he removed from Ousley's body.

Although the testimony of the witnesses to the shooting was somewhat varied, they testified consistently that Scandrick shot Ousley and that multiple shots were fired. Cheryl Scroggins testified that she saw Lonnie B. in front of Nathan's, that she encountered Ousley walking in the direction of the market as she walked home, and that she heard a gunshot, turned around, and observed Lonnie B. and Ousley in an argument. Ousley had his "hands up like he was trying to explain something." Scroggins then observed Lonnie B. aim a weapon at Ousley, who was on the ground, and shoot. Scroggins identified Scandrick in a photo spread. Anthony White also observed Scandrick shoot Ousley, and he identified him in court. Mark Saleh told the 911 dispatcher that "two guys shot one guy," and he identified Scandrick in a photo spread and in court. Finally, Sean Saleh observed Scandrick remove a brown bag from Ousley's pocket and shoot him.

Scandrick, heavily armed, was apprehended close to the scene within minutes of the shooting. Sergeant Mullins stated that Scandrick volunteered that Ousley "beat" someone, presumably Reid, over drugs. Amy Rismiller testified that Scandrick's gray sweatshirt was stained with Ousley's blood. Timothy Duerr testified that the spent shell casings recovered by Steve Bryant at the scene came from Scandrick's Glock.

Regarding Scandrick's testimony, the jury was free to discredit his version of events. If the jury believed Scroggins, who stated that Ousley stood "with his hands up" while arguing with Scandrick, "like he was trying to explain something," they could reasonably conclude that Ousley's posture was consistent with being confronted and not with being warned that Reid was armed and in the area. While Scandrick stated that he returned to the scene of the alleged attack on Reid merely to buy bread, and that he immediately attempted to "extract" himself from the "situation"  with Ousley, the jury was free to discredit his testimony in its entirety. Considering all of the evidence, the jury was free to conclude that Scandrick shot Ousley more than once. Scandrick's self-serving testimony on cross-examination further established his lack of credibility; he freely admitted that he lied to the police about Mark Green.

13

Regarding the State's alternative theory of complicity, we disagree with Scandrick that "the inference * * * is that Scandrick aided Ousley and not Reid." Scandrick testified that Reid used to live with him, is his cousin, and that Reid and Scandrick were together on the day of the shooting. Further, Sean testified that Scandrick and Reid were "always together" when they came to the store. In contrast, Scandrick merely described Ousley as a known drug dealer. Reid, his wallet, and multiple forms of his identification, along with a brown bag of alcohol Barrett recognized from his pursuit of Reid, were found at Scandrick's residence on Brooklyn. The brown bag recovered was also consistent with Sean's description of the item Scandrick removed from Ousley's pocket. Finally, Scroggins saw both men shoot Ousley, and Mark described "two guys" firing at Ousley. In other words, even if Reid fired the shot that killed Ousley, Scandrick's intent to commit the charged offenses is established under the circumstances herein.

Since there is sufficient evidence to support Scandrick's convictions, and because the jury did not lose its way in convicting Scandrick, Scandrick's first assignment of error is overruled.

(Doc. #5, PageID at 156-169).

The state court of appeals correctly applied *Jackson v. Virginia, supra,* at the first paragraph of its decision set out above, and thus the state court's decision is not contrary to United States Supreme Court precedent. Neither is the state court's decision an unreasonable determination of the facts in light of the forensic evidence presented in this case. In his Traverse, Scandrick contends that (1) White's testimony is "highly suspect and unreliable" (Doc. #7, PageID at 875); (2) Scroggins' testimony did not properly identify Scandrick as the shooter (Doc. #7, PageID at 876); and (3) neither of the Salehs initially identified Scandrick in a photo array (*Id.*).  He argues that the evidence is therefore not sufficient to show that he killed the victim, and that he should have been released "after the ballistics tests confirmed that [Reid's] gun was responsible for Ousley's death."  (Doc. #7, PageID at 877).

14

First, these arguments misunderstand the nature of Scandrick's conviction, which does not depend on who fired the fatal shot.  By statute, a felony murder involves the commission of a first- or second-degree felony that proximately causes another person's death.  Ohio Revised Code § 2903.02(B).  The complicity statute provides for Scandrick's conviction even if he merely played a supporting role to Reid's actions.  Ohio Revised Code § 2903.02(B).

Second, because *Jackson* places responsibility for weighing evidence and resolving conflicts in testimony on the trier-of-fact, "the assessment of the credibility of witnesses is generally beyond the scope of [habeas] review."  *See Schlup v. Delo*, 513 U.S. 298, 300 (1995).  Scandrick presents no legitimate basis for discarding *Jackson*'s required deference to the jury's credibility determinations with respect to White, Scroggins, or the Salehs.  *See id*.; *see also Johnson v. Mitchell*, 585 F.3d 923, 932 (6th Cir. 2009) (the proper analysis is "not whether [the court] would find the evidence sufficient to convict the petitioner of the charged offenses, but whether the state court was unreasonable in concluding that a rational trier of fact could so find.").

Petitioner asserts that "... his alibi in conjunction with the failure of the complaining witness to identify him as the assailant demonstrates his actual innocence in this case." (Doc. # 10 at 6). However, this Court may not consider the credibility of witnesses or weigh the evidence. *See Jackson,* 443 U.S. at 319-20; *see also Martin*, 280 F. 3d at 618. Even if other conflicting inferences could be drawn from the evidence, *Jackson* requires the federal habeas court to "'presume - even if it does not affirmatively

15

appear in the record - that the trier of fact resolving any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, __U.S.__, 132 S.Ct. 2, 6, 181 L. Ed. 2d 311 (2011) (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781).

The Ohio Court of Appeals reasonably and correctly applied *Jackson* in its analysis of Petitioner's claim of insufficiency of evidence. It cited specific evidence on the record from which a reasonable juror could find the presence of the elements of both offenses. Further, there was substantial evidence at trial whereby a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found beyond a reasonable doubt that Petitioner was guilty of murder and the felonious assault. Petitioner's sole Ground for Relief is without merit.

### D. <u>Ineffective Assistance of Counsel</u>

Because Scandrick has not utilized the remedy for ineffective assistance of appellate counsel provided by Ohio law, he cannot raise this claim in federal court as part of his habeas petition. Even if he could, it would not prevail in light of the clearly established deference to counsel required by *Strickland v. Washington*, 466 U.S. 668 (1984).

Scandrick argues that his counsel on appeal failed in his duty to raise a claim challenging the trial court's exclusion of Officer Gary White's testimony, which Scandrick alleges would have described only one shooter. (Doc. #7, PageID at 879). At the trial, the prosecution explained its objection to the testimony: "an unknown person told Gary White something allegedly. Gary White then told that to the coroner. So now

16

we're trying to get what that first person said by using Gary White, who we don't even

know if Gary White in fact said this to the coroner, if that's accurate.  But again, it's just

classic, pure hearsay."  (Doc. #5, PageID at 687-88).  Defense counsel responded, "I am

offering this at the insistence of my client . . . .  I would probably not even put him on but

for my client asking me to do so."  (Doc. #5, PageID at 688-89).  The court ultimately

sustained the objection to Officer White's testimony as hearsay.  (Doc. #5, PageID at

689).

The first bar to Scandrick's ineffective assistance claim is that he has not

exhausted his state remedies.  In Ohio, criminal defendants may "apply for reopening of

the appeal from the judgment of conviction and sentence, based on a claim of ineffective

assistance of appellate counsel."  Ohio App. Rule 26(B)(1).  Such applications may be

submitted up to ninety days after the appellate decision has been journalized, unless the

defendant shows good cause for delay.  *Id.*

The record does not show that Scandrick submitted a Rule 26(B) application after

the Ohio Court of Appeals decision on May 21, 2010, and the ninety-day period for filing

such an application has long expired.  Accordingly, Scandrick's claim of ineffective

assistance is procedurally defaulted unless the Court of Appeals accepts a delayed

application showing good cause.  If no application is filed in accordance with Rule

26(b)(2), then the Ohio courts will have no opportunity to address Scandrick's claim of

ineffective assistance, and therefore this Court should not consider it absent extraordinary

circumstances.  *See Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000); *Murray v.*

*Carrier*, 477 U.S. 478, 496 (1986).

Second, even if Scandrick had exhausted state remedies or could circumvent them, his ineffective-assistance claim would not overcome the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), which would govern the Court's consideration of this matter.

> Under *Strickland, a defendant must establish that his or her counsel was deficient and that he or she was prejudiced by the deficiency. Id.* at 687.  To demonstrate deficient performance, a defendant challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688… The court must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  "Judicial scrutiny of counsel's performance must be highly deferential" because it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*

*Robins v. Fortner*, 698 F.3d 317, 329 (6th Cir. 2012).

*Strickland* applies to ineffective-assistance claims at both appellate and trial levels. *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008).  In reviewing appellate counsel's performance, a court must "assess the strength of the claim appellate counsel failed to raise." *Id.*  Appellate counsel's assistance is only ineffective "if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

Assessing the strength of the claim that Scandrick's appellate counsel failed to raise, there was no reasonable probability that inclusion of the claim would have changed the result of the appeal.  The Ohio Rules of Evidence define "hearsay" as "a statement,

18

other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Ohio. R. Evid. 801(C).  The record contains no evidence – and Scandrick does not claim – that Officer White's testimony would have been different than the prosecution's description of it.  Defense counsel at trial offered no argument to the effect that the testimony would not be hearsay or would be admissible under any exceptions to the rule against hearsay.  Ohio. R. Evid. 802. Scandrick did not challenge his trial counsel's actions on this matter through a post-conviction motion prior to appeal.  There is no support for the notion that challenging the trial court's exclusion of Officer White's testimony had any reasonable probability of changing the result of the appeal.

Since Scandrick's claim of ineffective assistance of appellate counsel has not been considered by state courts, is procedurally defaulted, and, in any case would not pass the *Strickland* test, his claim therefore provides no ground for granting habeas relief.

### E.    Actual Innocence

Finally, Scandrick cannot rely on the actual-innocence exception to procedural default to support his petition because he presents no new evidence establishing the fact of his innocence.

"[A] claim of actual innocence can be raised 'to avoid a procedural bar to the consideration of the merits of [Scandrick's] constitutional claims."  *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (quoting, in part, Schlup, 513 U.S. at 326-27 (1995)). "'[I]n an extraordinary case, where a constitutional violation has probably resulted in the

conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.'"  *Souter*, 395 F.3d at 588 (quoting, in part, *Murray*, 477 U.S. at 496).

To claim actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324.  Such evidence must be strong enough to show "factual innocence, not mere legal insufficiency*." Bousley v. United States*, 523 U.S. 614, 623-24 (1998).  In order for actual innocence to excuse Scandrick's procedural default, he must show "'that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *Souter*, 395 F.3d at 590 (footnote omitted) (quoting *Schlup*, 513 U.S. at 327)*.*  "[T]he actual innocence exception should . . . only be applied in the 'extraordinary case.'"  *Souter*, 395 F.3d at 590 (quoting, in part, *Schlup*, 513 U.S. at 321).

Here, Officer White's testimony, even as described by Scandrick, does not make it unlikely that a "'reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *Souter*, 395 F.3d at 590 (footnote omitted) (quoting *Schlup*, 513 U.S. at 327).  In his Traverse, Scandrick claims that "Detective White would have testified to the fact that his investigation revealed the fact that there was only one person actually shooting Mr. Ousley and that person who is the actual shooter and thus killer, took a paper bag from the victim."  (Doc. #7, PageID at 878).  Even construing this claim in a light most favorable to Scandrick – not the standard in habeas review – he cannot show the fact of

his innocence with testimony that his bullets did not hit Ousley, because his conviction was for felony murder. The jury only had to conclude that Scandrick aided and abetted Reid in the murder. At best, Officer White's testimony would merely weigh against (1) other testimony from three witnesses that they saw Scandrick shoot at Ousley; (2) their testimony indicating that Scandrick and Reid were cooperating; (3) Scandrick's mention at his arrest of the prior attack on Reid; (4) the overall relationship between Scandrick and Reid; (5) the fact that Reid fled to Scandrick's home; and (6) Scandrick's own flight from the scene of a murder he witnessed. This case does not contain the extraordinary circumstances for which the actual-innocence exception exists, and a reasonable juror could still find Scandrick guilty of felony murder beyond a reasonable doubt.

Accordingly, Scandrick cannot rely on a showing of actual innocence to prevail on his habeas petition to have a court consider his case in light of additional testimony.

The conclusions reached herein are not debatable by jurists of reason and do not otherwise present issues adequate to deserve encouragement to proceed further. Consequently, a certificate of appealability should not issue.

### IT IS THEREFORE RECOMMENDED THAT:

1. Lonnie Scandrick's Petition for Writ of Habeas Corpus (Doc. #1) be denied and dismissed;

2. A certificate of appealability under 28 U.S.C. §2253(c) not issue; and

3. The case be terminated on the docket of this Court.

January 9, 2014                         ____s/Sharon L. Ovington____
                                            Sharon L. Ovington
                                    Chief United States Magistrate Judge

21

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).